**Mark A. HOPKINSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 83–208.

Supreme Court of Wyoming.

April 3, 1984.

Leonard D. Munker, State Public Defender, and Muriel J. Smith, Nogalis, Ariz., for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., Allen C. Johnson, Senior Asst. Atty. Gen., and Edward P. Moriarity, Sp. Asst. Atty. Gen., for appellee.

Before THOMAS, ROSE and CARDINE, JJ., RAPER, J., Retired, and SAWYER, District Judge.

RAPER, Justice, Retired.

Appellant was tried by jury in 1979 and found guilty of four first-degree murders and two conspiracies as charged. He was sentenced, upon recommendation of the jury, to life imprisonment on three of the murders, but sentenced to death for the first-degree murder of Jeff Green. The court on its own, it not being a jury decision, sentenced appellant on the guilty verdicts with respect to the conspiracies. On appeal, in *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982) (*Hopkinson I*), this court affirmed the guilty verdicts and life sentences on three of the murders and the sentences for the conspiracies as well. While also affirming the guilty finding, this court reversed the death sentence and remanded the case for a new sentencing trial as to the murder of Jeff Green. The sentencing phase was accordingly retried, and a jury again recommended the death sentence for the first-degree murder of Jeff Green. Appellant was sentenced to be executed. This court affirmed the death sentence in *Hopkinson v.*

*State*, Wyo., 664 P.2d 43 (1983), cert. denied — U.S. —, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983) (*Hopkinson II*).

The facts are thoroughly documented in *Hopkinson I* and *Hopkinson II* and need no reiteration. There was found to be no reasonable doubt as to appellant's guilt on all counts and the death penalty was justified as appropriate to all the circumstances, within the applicable law.

On July 1, 1983, appellant filed in the district court a motion for new trial. A motion for new trial is provided for by Rule 34, W.R.Cr.P.[1] Supplemental to the motion for new trial, various other motions were also filed. The trial judge denied all motions on September 14, 1983. Appellant appeals from the denial of the motion for new trial and here states as issues:

1. "Whether the Honorable Robert B. Ranck abused his discretion in not granting the Motion for a New Trial."

2. "Whether the Honorable Robert B. Ranck abused his discretion by not setting a hearing on the Motion for a New Trial."

3. "Whether the prosecution's intimidation, concealment and surprise tactics deprived Hopkinson of his right to a fair trial under both the federal and state constitutions."

4. "Whether the Honorable Robert B. Ranck abused his discretion when he failed to remove the special prosecutors from all phases of the Hopkinson case."

5. "Whether the Honorable Robert B. Ranck abused his discretion when he failed to recuse himself on all matters relating to the Motion for a New Trial."

We are now ready to discuss the current proceeding, which we will as required designate *"Hopkinson III"* for convenience.

We will affirm.

**I**

■ Appellant's motion for new trial filed with the district court states as reasons in support "1. New Evidence" and "2. Further Prosecution Tactics." The appellant agrees that in order to prevail where the motion is based on newly discovered evidence, the movant must satisfy the court:

" * * * (1) That the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial. [Citations.]" (Footnote omitted.) *Opie v. State*, Wyo., 422 P.2d 84, 85 (1967), followed in *Salaz v. State*, Wyo., 561 P.2d 238, 242 (1977), and approved most recently in *Grable v. State*, Wyo., 664 P.2d 531, 533 (1983).

Those found guilty of crime and sentenced never grow weary in seeking new trials on the ground of newly discovered evidence, but motions founded on that ground are not favored by the courts and are viewed with great caution. 3 Wright, Federal Practice and Procedure: Criminal 2d § 557 (1982), in discussing Rule 33, F.R.Cr.P., couched in the same pertinent language as Rule 34, W.R.Cr.P. Federal cases decided

---

1. Rule 34, W.R.Cr.P.:

"The court on motion of defendant may grant a new trial to him if required in the interests of justice. If trial was by the court without a jury, the court on motion of a defendant for new trial may vacate the judgment if entered, take additional testimony and direct the entry of a new judgment. A motion for new trial based on the ground of newly discovered evidence may be made only before or within two (2) years after final judgment, but if an appeal is pending the court may grant the motion only on remand of the case. A motion for a new trial based on any other grounds shall be made within ten (10) days after verdict or finding of guilty or within such further time as the court may fix during the ten-day period. The motion shall be determined and an order entered within ten (10) days after such motion is filed and if not so entered it shall be deemed denied, unless within such ten (10) days the determination shall be continued by order of the court, but a continuance shall not extend the time to a day more than 30 days from the date the verdict or the finding of guilty is returned."

under the rule are, therefore, persuasive. *Grable v. State,* supra.

■■■ *Grable v. State,* supra, and the precedent there cited stand for the established proposition that in Wyoming it is clearly within the sound discretion of the district court to either grant or deny a new trial based upon newly discovered evidence, and the district court does not abuse its discretion if it could reasonably conclude as it did. The burden is upon the movant to establish his right to a new trial. *Salaz v. State,* supra.

With impressive citation of authority, this court in *Grable v. State,* supra at 533, has also approved the so-called "Berry rule":

"'* * * The newly discovered evidence must be more than impeaching or cumulative; it must be material to the issues involved; it must be such as would probably produce an acquittal; and a new trial is not warranted by evidence which, with reasonable diligence, could have been discovered and produced at trial. * * *' *United States v. Allen,* 554 F.2d 398, 403 (10th Cir.1977), cert. denied 434 U.S. 836, 98 S.Ct. 124, 54 L.Ed.2d 97 (1977)."

With those general principles of law applying to new trials, we move along to a consideration of what the appellant presents to support his claim that a new trial should have been granted.

■ First, the appellant asserts that while he knew about the existence of various tapes of recorded telephone conversations, he only learned of the possible location of some eight or nine tapes from reading this court's opinion in *Hopkinson II.* This is gross misrepresentation.

By way of review with respect to the tapes, we will summarize from *Hopkinson II,* 664 P.2d at 80–81. While the trial of the

penalty phase was on appeal and following oral argument, appellant filed in this court a pro se "Motion of Proof, for Consideration in Showing Palin [sic] Error Existed, Which Was Not Properly Shown in Briefs or Argument." He complained that a taped telephone conversation should have been admitted into evidence. The question of the tape arose during an in-chambers conference. We have now again reviewed the transcript of proceedings in that regard. (*Hopkinson II*—Vol. X, pp. 787–799)[2] At page 788, it is disclosed that the trial judge for the record stated, "[n]ow, we're in chambers with counsel *and the defendant* and Mr. Bussart." (Emphasis added.) The tape was then in appellant's counsel's hands, who explained that it had been picked up by appellant's mother from his Salt Lake City room, turned over by her to appellant's brother, who turned it over to Mr. Van Sciver, appellant's trial counsel during the trial of *Hopkinson I.* From what appears in the transcript of the conference, the tape was of a recording made surreptitiously by appellant. It was of a conversation between the deceased, Jeff Green, and Green's attorney, Bussart. *Appellant's counsel stated to the trial judge:* "This is one of nine. The others were taken and were offered to be resold to Mark [Hopkinson]." (Emphasis added.) Mr. Moriarity, one of the prosecutors, asked, "[b]y whom? Can you say?" Appellant's counsel replied, "I can't say. I don't know. He [referring to appellant] doesn't know. He thinks it was possibly Taylor or possibly Green himself." Mr. Moriarity replied, "I got a copy of *this* tape from George Zunker." (Emphasis added.) George Zunker was appellant's counsel in *United States v. Hopkinson,* infra.

There is nothing in the transcript which would indicate that the State had any knowledge of the existence or whereabouts

---

**2.** Record references are included in this opinion as an aid to any further judicial consideration or review and the parties. *"Hopkinson I," "Hopkinson II,"* and *"Hopkinson III"* are included in each reference, since there are three records. "R." refers to the record, and "Tr." refers to the transcript of trial proceedings when used with

*Hopkinson I* references. It should be noted that in *Hopkinson I,* following the file volumes, the transcript is assigned separate volume numbers starting with "I." In *Hopkinson II,* following the file volumes, the transcript starts with the designation "Volume VII." There is no transcript in *Hopkinson III.*

of any of the tapes nor, according to its brief filed in this appeal, does it have any present knowledge of the whereabouts of any tapes, except the one that was the subject matter of the chambers conference. The only reference to there being other tapes was made by appellant's counsel and in appellant's presence. The knowledge of appellant's counsel that there were other tapes, if in fact there were, could only have come from appellant. An interesting observation is that the transcript of the tape recording attached to appellant's pro se motion in *Hopkinson II* and appellant's motion for new trial in the appeal now before us is entitled "Transcript of Million Sellers Vol. 4 (Side A)," which may indicate the existence of other tapes, of which the one produced in chambers in *Hopkinson II* is tape number four. That tape was found by appellant's mother in his room.

In any event, it is obvious that if there are other tapes, they are not new evidence but old evidence of which only the appellant—not the State—had knowledge before the trial of *Hopkinson I*. He must produce them. The burden of establishing grounds for a new trial is upon appellant. *Salaz v. State*, supra. There is no showing that appellant has shown due diligence in locating the tape of which he had knowledge. *United States v. Siviglia*, 686 F.2d 832 (10th Cir.1981), cert. denied —— U.S. ——, 103 S.Ct. 1902, 77 L.Ed.2d 289 (1983). Appellant's version is fanciful. *United States v. Oliver*, 683 F.2d 224 (7th Cir. 1982).

Next, there are a number of affidavits attached to appellant's motion for new trial which appellant claims present new evidence.

■ There are two James Harrison affidavits which infer that Mike Hickey, a State witness who had testified in *Hopkinson I* that he was hired by appellant to blow up the Vehar residence and did in fact throw dynamite into the basement causing the deaths of its three occupants, had as a friend discussed with Harrison, Hickey's part in the Vehar bombing, but Hickey "never indicated" Hopkinson had any part

in it. Later on affiant Harrison declares that Hickey stated to him that Hopkinson was innocent of any charges. However, the affidavits refer to Hickey's temporary absence when Hickey was in federal court. This apparently refers to appellant's trial in the United States District Court for Wyoming when appellant and Hickey were indicted for various offenses related to an explosive bomb. Hopkinson was convicted and Hickey was acquitted. Affirmed in *United States v. Hopkinson*, 631 F.2d 665 (10th Cir.1980), cert. denied 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 620 (1981). This court refers to that case in *Hopkinson I*, 632 P.2d at 95 and *Hopkinson II*, 664 P.2d at 49. Anyway, affiant Harrison stated that it. was before that trial that Hickey stated appellant had nothing to do with the bombing of the Vehar home. Nothing appears in the affidavit about Hickey's absence during the trial, *Hopkinson I*, for the murders of the three members of the Vehar family and Jeff Green. Hickey at that trial did definitely implicate appellant Hopkinson. Appellant presents no affidavit of Hickey that Hickey is recanting his testimony in *Hopkinson I*. Harrison's affidavits are not even recantation once removed. Hickey, at the time of the trial of *Hopkinson I*, was under the Federal Witness Protection Program and not in the Wyoming State Penitentiary, but in federal custody. (*Hopkinson I*—Tr. Vol. VI, p. 806) His address at the time of the retrial of Hopkinson II in 1982 (*Hopkinson II*—Vol. I, p. 77) was c/o United States Marshal. There is no showing by appellant that he was in contact with Harrison after the *Hopkinson I* trial.

Because of their inconsistency and lack of any statements made by Hickey after the murder trial of Hopkinson, the affidavits are misleading and have no value as a recanting or impeachment of Hickey's testimony at that trial. It must be remembered (*Hopkinson I*, 632 P.2d at 94–95) that appellant, through perjured testimony, was protecting Hickey from being charged with the Wyckhuyse girl's murder until such time as Jeff Green at the trial of Hysell for

the murder of the Wyckhuyse girl broke down and confessed that his statements incriminating Hysell were lies and that Hickey had killed her. Later, Hickey pled guilty to the murder of Kelly Wyckhuyse and, according to *Hopkinson I*, was granted immunity as to the Vehar murders in exchange for his testimony with respect to the latter.

Under close scrutiny, the Harrison affidavits are not what they purport to be. At the most, they are no more than impeachment of Hickey's testimony but of little value there. Hickey's testimony was in minute detail taking up 476 pages of testimony. (*Hopkinson I*—Tr. Vols. VI, VII, VIII, pp. 765–1241) He was cross-examined at length by appellant's counsel who had Hickey's grand jury testimony and the testimony given at Jamey Hysell's trial along with other statements made by Hickey. It must be recalled that the vast array of prosecution testimony and other evidence, examined at length and in detail in *Hopkinson I* and *Hopkinson II*, corroborates Hickey's trial testimony that appellant hired him to blow up the Vehar home. In spite of Hickey's background, the jury believed him. It was a question for the jury. The rule is that any newly discovered evidence must be so material that it would produce a different verdict, if the new trial were granted, and must be more than impeaching. *Opie, Salaz, and Grable*, supra. The Harrison affidavits do not produce testimony within those concepts.

█ The affidavits of Richard Weddle, a person in the Wyoming State Penitentiary at the time of making one affidavit and a prisoner in a Colorado county jail at the time of making another, generally state that he met Jeff Green in a park in Evanston at 2:00 a.m. of the morning the Vehar home was blown up. Weddle then went on to state that Green was looking for explosives to blow up the Vehar home to scare him because he knew too much about Green's unlawful activities and was beginning to act like a " 'one man police show.' " The information purportedly came about in that Green had hired Vehar to incorporate a business which would deal in stolen property. Weddle "thought" the person looking for explosives with Green was Jim Taylor, but it was dark and he could not clearly see. Weddle states that Hopkinson's name was not mentioned during that conversation. There are some immaterial references to thefts by Green from persons not in any way associated with the murder of any of the victims. Affiant then comes to the bare-faced conclusion: "I know that MARK HOPKINSON was not involved in any way with the bombing of the Vincent Vehar home or the death of JEFF GREEN."

In his second affidavit, Weddle dwells predominantly on purported intimidation of him during continuing grand jury investigations by the prosecutors, Spence and Moriarity, as well as police officers. He asserts that he told the truth once to the grand jury but lied on a second appearance because of the intimidation. In the same affidavit, he asserts he was afraid to say anything important in his questioning because of a purported threat from Jim Taylor and he also worried about what effect it might have on his own trial in which, according to his first affidavit, he was being prosecuted for sexual assault.

After his trial, affiant goes on to say, he made complete revelations of anything he knew about the Vehar bombing and Jeff Green to Hopkinson's attorneys, Van Sciver and Brass, and they visited him in a Utah prison. Upon his return to the Wyoming State Penitentiary, he asserts he was afforded an opportunity to talk with Hopkinson, but the conversation was taped by order of the warden, which prevented him from giving Hopkinson some of the information Hopkinson asked of him. The affidavit closed with a statement of Weddle's having personal knowledge of various crimes committed by Jeff Green; that he had seen Green with dynamite; that Green knew how to use it; and that he had seen Green explode it for fun. Scratched out of the affidavit and initialed "R.W." were the words "plus I gave Jeff Green some other explosives which was [sic] stolen from a guy I worked for in Evanston."

This court is aware of Weddle's trial for sexual assault. His conviction was appealed and affirmed in *Weddle v. State*, Wyo., 621 P.2d 231 (1980). It is apparent that Weddle is unfamiliar with all the evidence which links appellant to the murders of the Vehars and Green. If the conversation with Green took place at 2:00 a.m. on the same morning that the Vehar home was dynamited, and Green got no explosives from Weddle, Green's time between then and 3:35 a.m., when the home exploded, is unaccounted for by Weddle's affidavit. See opinion in *Hopkinson I*, 632 P.2d at 95, and the testimony of Randy Hodson, an Evanston police officer dispatched to the scene (*Hopkinson I*—Tr. Vol. V, p. 427) to establish date and hour of the explosion. Hickey, the person who, by his own admission and whom extensive evidence shows, tossed the bomb into the basement, is accounted for during the morning hours before, during and after the explosion by corroborating evidence. His testimony included his manufacture of the bomb, and he directed officers to the dynamite box lid which they found and which carried identification markings. Weddle's view of the facts becomes unbelievable in light of all the evidence in the case. Even if Weddle were produced as a witness in a new trial, his testimony would not stand up under cross-examination nor is it probable that it would produce a different verdict. His statement that he "knows" Hopkinson to be innocent of the murders has no support in his affidavit and is valueless. Weddle's admission that he lied to the grand jury makes his story further suspect.[3] His attempt to show Jeff Green to be a criminal is not new evidence. The evidence in *Hopkinson I* shows Green to have a criminal record. See *Hopkinson I*, 632 P.2d at 94–95. Jim Taylor, who purportedly threatened Weddle, is not a new actor introduced by Weddle. He testified during the trial. See *Hopkinson I*, 632 P.2d at 94. His full name is Harold James Taylor. His testimony showed that he was also a person with the type of background useful to appellant who hired him for a fee of $600 to shotgun Vehar, but Taylor spent the money which the evidence accounted for and backed out. Taylor also sold an "untraceable" handgun to Hopkinson. Appellant, as a convicted felon long before his conviction in *Hopkinson I*, could not lawfully acquire and possess a firearm. The handgun was given by appellant to Hickey, who directed officers to its whereabouts, and it is an exhibit in *Hopkinson I*. Weddle's charges of intimidation by the prosecutors are after the fact as to the guilt trial, and are, at the most, cumulative of accusations, made by the defense at the trial of *Hopkinson I*.

■ The unsigned affidavit of Cindy Taylor Schrode, the former wife of Harold James Taylor, is of no value. There is no assurance that she would so testify, and, even if she would, there is not anything new set out because, for the most part, it recites dealings such as loans of money to

---

**3.** While not controlling, we believe it worthy of mention since Weddle admitted lying once to the grand jury convened after *Hopkinson I*. The prosecution felt that Hopkinson's conduct even after conviction in *Hopkinson I* and while in prison was useful to the jury in its sentencing role in *Hopkinson II* when the sentencing phase was retried. This court in *Hopkinson I*, 632 P.2d at 154, observed that society is entitled to protection from individuals who not only may but probably will kill again. The jury shall hear evidence relevant to a determination of the sentence but the prosecution must give notice to the defendant of what it proposes in that regard. Section 6–2–102(c), W.S.1977. In *Hopkinson II*, the prosecution served notice that it would call Richard Weddle. (*Hopkinson II*—Vol. III, p. 463, et seq.) A lengthy statement of what he would testify to is set out, though he was not called as a witness. It is related that appellant, while in the penitentiary, through outside contacts, told Weddle he had Jeff Green under surveillance. Further, appellant coached Weddle in perjured testimony involving a fictitious story of the bombing murders to implicate Jeff Green and Harold James Taylor. It was alleged that appellant stated, " 'Hickey is a dead man,' " and that appellant had a contract out on him. He, appellant, told Weddle he would take care of him " 'for life' " but at the same time threatened him and said he would get at families as well to accomplish his purpose. Appellant purportedly cross-examined Weddle to keep his story straight. It is unbelievable that the prosecution would make false representations of Weddle's proposed testimony, taken before a grand jury.

her by appellant, and work she and her husband did for appellant at his trailer park, all of which the appellant as a party would have knowledge. *Salaz v. State,* supra. The unsigned affidavit tells that her husband and she bought a horse for $600 (the amount paid Taylor to shotgun Vehar), and appellant loaned them the money to make the purchase. The document also describes the circumstances under which appellant purchased the handgun: appellant, nervous and shaken at the time, wanted to and did buy the weapon because "some man named Hysell, I think, was threatening to shoot Mark A. Hopkinson." The paper ends with "[a]fter the bombing of the Vehar home in Evanston, Wyoming I heard rumors that Jeff Green had blown up that house." Rumors are not evidence.

Even if the affidavit had been signed and notarized, appellant would have had personal knowledge of all these dealings since he was privy to them. He could have called Cindy Taylor Schrode at the time of the trial of *Hopkinson I.* He elected, however, to not call witnesses or put in any evidence on his behalf. He did that knowingly and intelligently, after being fully informed by the court and his own counsel of his rights in that connection, which we will mention in more detail in connection with the affidavits of Jeff Dunn, Hap Russell, Helen Russell, and Courtney Klekas, n. 6, infra.

Hickey testified that the weapon purchased from Taylor was given to Hickey when appellant and Hickey were discussing ways to kill Vincent Vehar or William Roitz. Hickey was waiting in a pickup when appellant purchased the handgun. (*Hopkinson I*—Tr. Vol. VII, pp. 935–961)

The unsigned affidavit of Kristi King presented nothing new of a material nature and will be discussed further in Parts II and III of this opinion. The closing statement of the unsigned document states that she does not remember what her testimony was. She may not remember, but the record in this case does. The paper does not point to any change in her testimony, even if true. We will return later at vari-

ous places to discuss the role of Kristi King.

The affidavit of Jonathan Domonic Ceccia, also known as Jonathan Domonic Mauro, a Wyoming State Penitentiary inmate since May, 1981, contributes nothing to establish any innocence on the part of appellant. He asserts he was not let out on parole because of his friendliness with appellant. He, according to his affidavit, had written Spence complaining about what he believed to be his unconstitutional treatment by penitentiary personnel and wanted to sue. He was, according to his affidavit, called' before the grand jury in connection with its continuing investigation of the murder of Jeff Green. Affiant says that Mr. Spence talked to him, in the lobby of the building in Evanston where the grand jury was meeting, advising that he had received affiant's letter and indicating he had a good case. He claims Spence became angry at him because he produced nothing incriminating against appellant. He further states that when he was returned to a holding cell, he was slapped and pushed around by the jailer and another officer. He also states that his statements to the grand jury were true and not made for any purpose except to respond truthfully to questions put to him. We find nothing in the record as to what his testimony was. There is nothing here to indicate a new trial is required.

Another Wyoming State Penitentiary inmate, Bobby Barnes, in his affidavit asserts that he was told by jail officials in Evanston when he was taken there to testify before the grand jury that if he cooperated with Spence and Moriarity and gave the right kind of information about appellant, he could get out of prison. He goes on to say that when he told jail officials he had nothing to say about Hopkinson, he was threatened, pushed around, and denied basic sanitary equipment needed by one in jail. He had also prepared a list of grievances about county jail treatment to be read to the grand jury. There is nothing material here.

■ The affidavits of Jeff Dunn, Helen Russell, Alvin Russell, and Courtney Klekas will be considered together in that they are interrelated. Alvin Russell is also known as Hap Russell. He testified in *Hopkinson I*. (*Hopkinson I*—Tr. Vol. XI, p. 1334, et seq.) A summary of his testimony follows. The court reporter shows his name as Allen G. Russell, III. He was a bookie and became a close friend of appellant in Salt Lake City. He moved in with appellant in a condominium owned by the latter. Russell testified he shared the cost of carpet, drapes and wall covering and that was all. It was, according to Russell, later agreed between appellant and him that Russell's interest in the place was $6,500.

They lived together some five months. After appellant was arrested and sentenced on the federal explosives charge, Russell continued to occupy the condominium. When appellant was sentenced to prison following his conviction on the explosives charge, and sent to the federal prison facility at Lompoc, California, appellant from there made a series of some 46 collect telephone calls to the condominium telephone number. See *Hopkinson I*, supra, 632 P.2d at 96, n. 9, for chart showing dates of calls to Russell along with the many other telephone calls placed by appellant from Lompoc. Appellant's mother paid Russell's expenses (from appellant's money) to visit appellant at Lompoc, which he did.

Before Russell was questioned about the purpose of his trip, the prosecutor requested that the court advise Russell of his right not to testify in that his testimony would incriminate him and he could not be compelled to be a witness against himself, a protection afforded by the Fifth Amendment to the United States Constitution. In chambers the trial judge did advise him of those rights and recommended that he consult with his attorney before testifying in regard to his participating in the subornation of perjury. The defense counsel was anxious that the witness make his own decision without the necessity of other counsel's advice in that regard, because it was expected his testimony would be favorable to the appellant and even urged the prosecutor to grant immunity to the witness.[4] The prosecutors in this case were special prosecutors and argued they had no authority to grant such immunity, or even authority to move for the granting of immunity. The court agreed and declared that only it could grant such authority but would only do so upon motion of the prosecution. The prosecutors were reluctant to obtain a clearance from the county attorney, whom they considered the only one who could move the court to grant immunity from prosecution. Russell had apparently been granted immunity from a federal prosecution for purchasing or attempting to purchase perjured testimony, through the United States District Attorney for the District of Wyoming, but it was not considered applicable to the state of Wyoming. Before the court recessed—it was late in the afternoon—it was left that Russell would confer further with his attorney,[5] and a decision would be made the next morning.

4. Appellant's opening statement to the jury included that the evidence would show that appellant only "was suborning perjury" not arranging murder, that he was trying, through Russell, to find a person in Salt Lake City who would give false information that Jeff Green was in Salt Lake City trying to find someone who would blow up a vehicle, in Salt Lake City, and he was willing to pay as high as $15,000 to $20,000, to obtain a new trial in federal court where appellant had been found guilty of interstate transportation of explosives. (*Hopkinson I*—Tr. Vol. IV, p. 33) The evidence in the federal case showed the explosives were being transported by Green who would blow up the vehicle of an attorney by the name of Mariscal, in Arizona, to persuade Mariscal to pay money purportedly owed appellant. *United States v. Hopkinson*, supra.

5. When Russell first called his attorney, Russell reported back to the trial judge that the only response from his attorney was "bullshit," he would call back later because he was busy in court and when he called back, he wanted Moriarity (special prosecutor) on the phone. What further conversation, if any, Russell had with his own counsel does not appear.

When the court reconvened, the special prosecutor advised that the county and prosecuting attorney for Uinta County had authorized him to move the granting of immunity from prosecution limited to perjury—not murder—and that, along with the advice of defense counsel that it was necessary for his case that Russell testify, he so moved. Mr. Russell agreed. The court granted the motion. After some preliminary questioning, Russell was interrogated as an adverse witness.

Russell then testified that at Lompoc, appellant asked him to find someone reasonably "clean" who would testify to the fact that such person had been approached by Jeff Green to blow up another man's truck in Salt Lake City. He further testified that appellant was willing to pay $15,000 to $20,000 for an affidavit to that effect and such testimony. It was Russell's testimony that the appellant wanted the affidavit to seek a new trial in the federal case, *United States v. Hopkinson*, tried in the United States District Court for Wyoming in which he was convicted of various crimes related to the interstate transportation of explosives. The facts of that case are related in *United States v. Hopkinson*, supra. Jeff Green had testified in the federal trial that Hopkinson, Hickey and Green were present when a dynamite bomb was made at Hopkinson's residence. Hopkinson asked Green to take the bomb to Phoenix and blow up Mariscal's car. The plan failed because Green was apprehended in Coleville, Utah, for speeding and the bomb was discovered in Hopkinson's car, a Lincoln Continental which Green was driving. See also the testimony of Barry Strohbehn, special agent for the Bureau of Alcohol, Tobacco and Firearms (*Hopkinson I*—Tr. Vol. VIII, pp. 1355, 1361–1362) set out in *Hopkinson I*, supra, 632 P.2d at 117. Appellant posted a $2,000 bond for Green's release and from the $2,000, a $250 fine was paid on the speeding violation.

Appellant's mother delivered the first $4,000 in cash to Russell at appellant's request. (*Hopkinson I*—Tr. Vol. XII, pp. 1440–1446) Russell then obtained a picture of Jeff Green from Jennifer Larchick, which she had cut from a high school yearbook. He delivered it to John Suesata, to whom he paid the $4,000 plus $500 from his own pocket. (*Hopkinson I*—Tr. Vol. XII, pp. 1452 & 1485) Suesata was to find someone to furnish the perjured testimony. This was spoken to in *Hopkinson I*, supra, 632 P.2d at 141.

This is where Jeff Dunn came into the scheme. John Suesata and Jeff Dunn, a land developer, were partners in running a gambling room in Salt Lake City. Russell was a friend of both. The $4,500 to Suesata plus another $9,000 of Hopkinson's money were transferred to Dunn. (*Hopkinson I*—Tr. Vol. XII, pp. 1482–1486)

However, at the time of the trial of *Hopkinson I*, prosecution counsel knew and immediately following the above testimony asked Russell, "[w]ell, actually your testimony will be that the money that you paid to Mr. Dunn was for a real estate transaction; isn't that right?" His answer was "yes," and his claim was that he borrowed the $9,000 from appellant. When asked if he had paid it back, he replied "yes and no" and explained $6,500 of that was what he had spent furnishing and decorating appellant's condominium and he still owed appellant $2,500. (*Hopkinson I*—Tr. Vol. XII, pp. 1486–1493)

At this point, Russell's mother, Helen, is brought into the investment contrivance. Russell testified that she also invested $5,000 with Dunn. (*Hopkinson I*—Tr. Vol. XII, p. 1495) It was the prosecution's theory and argument that this was a money laundering conspiracy to wash the money which was actually paid to murder Jeff Green.

The sequel to those transactions was Russell's testimony that only $4,500 was paid to Suesata for the perjured testimony with the remainder of a total of $15,000 to be paid when the perjured testimony was found. A Todd Hall was to get $10,000 and Suesata was to get $5,000 of which the $4,500 had been paid when the affidavit was signed. (*Hopkinson I*—Tr. Vol. XII, pp. 1496–1499)

Just prior to Jeff Green's murder, Green's picture, obtained from a high school yearbook by Jennifer Larchick at the instance of Russell, was delivered to Suesata. On the 16th day of May, 1979, Russell signed a note for $9,000; on May 17th Jeff Green disappeared.

The purpose of all the foregoing review of Russell's testimony with respect to Russell, Jeff Dunn and Russell's mother is to point out that the material set out in the affidavits of Jeff Dunn, Helen Russell (Alvin Russell's mother) and Alvin Russell is not newly discovered evidence but was brought out in the trial in *Hopkinson I.* What appears in the affidavits of Jeff Dunn and Helen Russell could have been testified to at that trial, but appellant elected not to produce evidence on his own behalf.[6] Into the same category can be

6. The following colloquy (*Hopkinson I*—Tr. Vol. XIII, pp. 1690–1695) took place in chambers with appellant present:

"THE COURT: * * * And defense counsel just came into chambers and told me that the defendant is not going to put on any testimony. And they have the absolute right to do that and for reasons, you know, I don't know about and it's a decision the defendant has to make. But let me tell you, this is not the case but I don't want to leave anything out.

"There are certain rights you give up if you plead guilty. Now, let's say you were in my court pleading guilty. This is what I would say that you give up.

"You give up: 1. The right to a presumption of innocence; 2. The right to a speedy and public trial; 3. The right to a trial by jury; 4. The right to see, hear, and question all witnesses; 5. The right to present evidence in your favor; 6. The right to testify or to remain silent; 7. The right to have the Judge order into court all evidence and witnesses in your favor; 8. The right to have a competent lawyer defend you; 9. The right not to be convicted except by proof beyond a reasonable doubt; 10. The right to appeal if convicted.

"Now, of course, we are not in that posture but what you have said now is that you are not going to put on any evidence which means the trial is over except for instructions to the jury and closing argument; am I correct?

"MR. SPENCE: That's correct.

"THE COURT: Mr. Van Sciver?

"MR. VAN SCIVER: That's correct.

"THE COURT: All right. Now, you would be giving up, by not putting on your case, the right to present evidence in your favor; the right to testify or to remain silent; the right to have the Judge order into court all evidence and witnesses in your favor; the right to have a lawyer, who is obvious to me very competent, represent you in your phase of the case. And that would be all because the right of appeal is you have that if convicted in this case regardless. It's just automatic. But that's what you give up. The legal word for giving up is waiving. You waive those things.

"And I need to know, Mr. Hopkinson, if you understand?

"MR. HOPKINSON: Yes. I'm very well aware of the situation, the rights I would give up and the rights I have and everything. I'm totally competent of my decision.

"THE COURT: Well, it's your decision and, of course, you have been in jail up here for some time and you have been thinking about it for some time. You have been sitting through the trial and you appear to me to be an intelligent person. You certainly appear to me to be competent. I have no hesitancy at all in just having watched you for 3 weeks knowing that you really know what's going on from your responses in chambers and in the courtroom.

"And I would like to ask you if I could, and you don't have to answer me, but has anybody pressured you in any way to make this decision?

"MR. HOPKINSON: No. Absolutely not. I made it strictly as trying to put myself in the position of looking at this through a legal matter. My opinion is there is nothing here that makes sense to me and I think I'm of good sense and I don't think I'm nervous. All of this stuff to me doesn't make sense so, therefore, I'm trying to psychologically find where the jury is standing and I have to believe nothing makes sense to them either, and that's where my decisions come from. So it's totally competent with thoughts and not just out of the air.

"THE COURT: It's your own decision?

"MR. HOPKINSON: Yes.

"MR. SPENCE: Had you discussed it with your counsel?

"MR. HOPKINSON: Yes, I talked to Mr. Van Sciver about it.

"MR. SPENCE: You got his advice?

"MR. VAN SCIVER: We went through the witnesses and what it would open and I think it would open and I think he's aware, and I honestly can see some merit in what he's doing. Even though it's a case of this magnitude it scares me, but he wants to roll the dice and ultimately that decision is yours, right?

"MR. HOPKINSON: The reason I like to roll the dice in this case is because I know Mr. Moriarity's and Mr. Spence's incredible capabilities of rebuttal and they can't rebut [sic] something we haven't put on.

"THE COURT: And that has to do with part of your reasoning, I guess?

placed the material contained in the affidavit of Courtney Klekas. It is at the most only corroborative of Russell's testimony with respect to the interests of appellant and Russell in the condominium. None of the events there set out could possibly result in a different outcome.

■ The affidavit of Mark Hopkinson, appellant, is of no value. It is unsigned so he is apparently still exercising his privilege to not testify. It, therefore, adds nothing. He sets out matters of which he had knowledge at the time of the trials in *Hopkinson I* and *Hopkinson II*. He elected not to testify, which is a constitutional right he has. We are unaware of any authority for granting a new trial on that basis nor has appellant furnished us any assistance in that regard.

We will, however, call particular attention to two statements in appellant's affidavits. The first is his statement in paragraph "7." where he sets out that the $15,000 sent to Kristi King and returned by her was sent to the "bank in Overton, Utah, as prosecution is well aware." That is not newly discovered evidence. The draft to the Overton bank in the sum of $15,004.75 was brought out in *Hopkinson I* evidence. (*Hopkinson I*—Tr. Vol. XII, pp. 1527–1528) It was dated May 21, 1979, the day after Jeff Green's body was found. The jury was aware of it. This is not new evidence. The State's theory was that was only cover-up and another $15,000 was used to pay

hired killers. The jury accepted that version.

The second statement is that set out in paragraph "9." where appellant attempts to explain that there was no defense presented because his attorneys told him there were "so many errors in the case that he would get a new trial." After being informed at length by the trial judge of his right to put on a defense, he elected not to and personally advised the court that "I know Mr. Moriarity's and Mr. Spence's incredible capabilities of rebuttal and they can't rebutt [sic] something we haven't put on." See n. 6, supra. Appellant chose this strategy. A desire to change strategy or tactics after an unfavorable verdict is not new evidence, nor ground for a new trial. *United States v. Beasley*, 582 F.2d 337 (5th Cir.1978); *United States v. Soblen*, 203 F.Supp. 542 (S.D.N.Y.1961), aff'd 301 F.2d 236 (2nd Cir.1962), cert. denied 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810.

Appellant's counsel in this appeal also furnishes an affidavit which does no more than submit argument and furnishes nothing upon which to base a new trial. Her allegations of improper tactics by the prosecution find no support in the record, which this court combed from end to end during its consideration in *Hopkinson I* and *Hopkinson II*, and has reviewed in consideration of this appeal.

■ When the trial judge has denied a motion for new trial without a hearing, he

"MR. HOPKINSON: That's correct.
"MR. VAN SCIVER: Now, I guess we got two witnesses we are going to put on. One is his exwife, Judy Hopkinson, to talk about the night in question in terms of the night of the bombing, and the other one I haven't told you about him. He's not on the list and it didn't develop because I didn't know about Arlene Sweat. He's the Mountain Fuel guy. I don't think it's that important to attack but it does demonstrate there is a different version. Is that what you want to do or do you want to do it the other way? I'm not deciding this alone.
"MR. HOPKINSON: Is rebuttal, the way I understand rebuttal is he can only rebutt [sic] what's put on the stand and not introducing another entire case?

"MR. VAN SCIVER: He can't commit himself on that he has to wait and see what happens, but that's right.
"THE COURT: That's basically correct.
"MR. HOPKINSON: Let's put on the two and close it.
"MR. VAN SCIVER: All right. Judge, can I have a minute and then let's go do it.
"THE COURT: Yes.
"(In court)
"THE COURT: Please be seated. The Court notes the presence of the jury, counsel and the defendant.
"Is the defendant ready to proceed?
"MR. VAN SCIVER: Defense is ready to proceed. We are ready to proceed, your Honor, but the defense rests." (No witnesses were actually called even though it had been previously indicated that some would testify.)

has, by examination of the affidavits and written argument, found that there was no new evidence offered that showed any witness who testified during the trial was any more than truthful. The Supreme Court in *United States v. Johnson*, 327 U.S. 106, 66 S.Ct. 464, 90 L.Ed. 562 (1946), has said that the findings of the trial court based on newly discovered evidence should remain undisturbed by appellate courts except for the most extraordinary circumstances. We cannot see that this view by the court has changed. The court went on to say that the judge who tried the case is exceptionally well qualified to make that decision because he watched the case unfold. As there emphasized, the determination of guilt or innocence as an outcome of a fair trial and prompt enforcement of sentences are objectives of the administration of the criminal justice system. Courts should not be parties to inordinate delay by attempting to try de novo motions for a new trial based on conflicting evidence and such motions on appeal should be dismissed as frivolous.

## II

■ Whether the district judge's refusal to set a hearing on the motion for new trial is an abuse of discretion is the next question. We have just concluded in this opinion an exercise in which various parts of the record of the trial, *Hopkinson I,* were exhumed. It must be realized that working from a written record is considerably different than having lived as presiding judge from voir dire to verdict in a trial that commenced on September 3, 1979, and ended with the discharge of the jury on September 27, 1979. We must give weight to the fact that the trial judge who presided at the trial denied the motion for new trial. *United States v. Hersh*, 415 F.2d 835 (5th Cir.1969); *United States v. Garrison*, 296 F.2d 461 (7th Cir.1961), cert. denied 369 U.S. 804, 82 S.Ct. 643, 7 L.Ed.2d 550 (1962). He was exposed to not only the words spoken, but also the appearance, demeanor and emotion of all the actors. To hear and watch all the detail unfold over such a period of time burns all its drama into the

memory. That memory has been refreshed and sharpened by an additional trial in the penalty phase, *Hopkinson II,* which started at 9:00 a.m. on the 17th day of May, 1982, and ended at 9:00 p.m. on the 27th day of May, 1982. The trial judge intimately knew what is in the record, having had the responsibility of paying close attention to every little facet of what took place for the purpose of ruling and being alert to the possibility of error creeping in. He could easily see from the motion for new trial the futility and shallowness of the type of attack being made on the evidence and trial proceedings, without listening to an oral argument that would add nothing.

■ There is no law which requires a hearing on a motion for new trial unless the motion and its supporting papers require confirmation. The law is clear that a motion may be disposed of without a hearing and it is within the sound discretion of the district judge to do so. *United States v. Hedman*, 655 F.2d 813 (7th Cir.1981); *United States v. Metz*, 652 F.2d 478 (5th Cir.1981); *United States v. Nace*, 561 F.2d 763 (9th Cir.1977); *United States v. Ward*, 544 F.2d 975 (8th Cir.1976); *United States v. Pitts*, 508 F.2d 1237 (8th Cir.1974), cert. denied 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975). We have reached into the evidence produced at trial, and examined it in the light of what appellant asserts is something new and different that would probably demand or suggest a different outcome than guilt. Our review discloses nothing of the sort. There was no abuse of discretion.

The appellant wanted to examine witnesses as a part of the hearing, namely Kristi King, Cindy Taylor Schrode, John Suesata, Mike Hickey, J.R. Goo and Donald Ray Hagerman. Kristi King and Cindy Taylor Schrode refused to sign affidavits prepared at appellant's instance which were presented to them. We have nevertheless reviewed them in Part I of this opinion to see if their testimony, as appellant represents it would be, is suitable justification to grant a new trial. (Some of

the issues presented by appellant are overlapping as to some witnesses so their testimony must be considered in different parts of this opinion.) We found as to Kristi King nothing new was offered. She testified at the trial in *Hopkinson I* and was subjected to cross-examination. The court advised her at the trial of her right to talk with defense counsel, but she was not interviewed by counsel though they were present when she was so advised. If she had talked with them, they would have inquired into the matters set out in an affidavit apparently prepared by counsel for appellant, because at the trial appellant's counsel complained that the prosecution was frightening her to prevent her from talking with defense counsel. The trial judge talked to her, because he was concerned with her appearance on the stand. Their conversation was at once made available to counsel by having the court reporter read it back to them. Her concerns were not as represented by counsel. There were no objections. We cover this further in Part III of this opinion.

As pointed out in Part I, the proposed testimony of Cindy Taylor Schrode is not new. It deals with contacts she had with appellant and of which appellant had knowledge at the time of trial so it is, therefore, not new evidence.

■ As to John Suesata, the record discloses that he refused to testify in *Hopkinson I*, as a Fifth Amendment privilege. His attorney was present and at his side. (*Hopkinson I*—Tr. Vol. XII, pp. 1595–1607) A few questions were asked in the presence of the jury. The jury was excused from the courtroom. He refused outside the hearing of the jury to answer many questions regarding the appellant, Mark Hopkinson, Scott Hopkinson, Hap Russell, and Mr. Dunn or even admit that he knew them. It must be realized that Hap Russell in his testimony heavily implicated Suesata in the suborning of perjury and perhaps as an accomplice to the murder of Jeff Green. We also note in the record of *Hopkinson I* that Suesata was subpoenaed to appear before a federal grand jury. He

did not appear, was charged with contempt, and was arrested. An information was filed charging him with failure to respond to a subpoena. He entered a plea of not guilty. Ultimate disposition is not shown. (*Hopkinson I*—R. Vol. IV, p. 319) It would be an exercise in futility to persuade him to testify. The trial judge knew that, having been through the experience. Suesata would not talk to appellant's counsel. In the absence of any showing that he is ready to testify, the trial judge was correct in not allowing a hearing and not allowing him to be subpoenaed.

J.R. Goo testified in *Hopkinson I*. (*Hopkinson I*—Tr. Vol. V, p. 327, et seq.) He was treasurer of the sewer board. He ran a cafe and bar, originally with his father and then alone. He was a good friend of the appellant. His testimony was directed toward the on-going dispute between appellant and the sewer board of which he had knowledge. Appellant urged him to take steps to remove from the board William Roitz, for whom the evidence showed appellant entertained an intense hatred which had been going for years before. Appellant curried the ego of Goo, flattered him, and lent him money without interest to keep the cafe afloat. However, appellant asked for and got some fancy liquors in lieu of interest on one occasion.

Goo tried to persuade the board that appellant was getting a bad deal on the sewer hookups for appellant's trailer park but eventually changed his mind after the board commissioned him as treasurer to collect unpaid hookup fees from appellant. (*Hopkinson I*—Tr. Vol. V, p. 338) Appellant refused to pay; his attitude toward Goo became unpleasant and hostile. One evening an unknown person came into the cafe as Goo was closing up, pulled Goo's apron over his head and administered a vicious beating.

When the board sued appellant, appellant was furious and shaking and told Goo, " 'I'll get everyone [sic] of you son-of-a-bitches.' He says, 'I'll get William, get all the Roitzes, Vince Vehar, Nancy, I'll get everybody even if I have to come back

from my grave, I'll get all of you.'" Goo further testified that he was not only afraid because of his beating and the described threat, but on another occasion appellant said with reference to Goo's wife and children, "'Wouldn't it be a shame if they got beat up, cut or hurt?'"

After Vincent Vehar was killed by the blowing up of his residence, appellant came into Goo's cafe and said, "'I am glad the old son-of-a-bitch is dead. If somebody wouldn't have done it,' he says, 'I would have done it myself.'"

Goo was thoroughly cross-examined, during which an attempt was made to discredit his testimony but, if anything, it was strengthened. Goo was firm, forthright, and consistent. The appellant now apparently seeks to cross-examine him further because Goo has refused to talk to his counsel, but Mrs. Goo had told appellant's counsel they had lost their home and the business, and were receiving threatening phone calls.

We agree with the trial judge that no useful purpose would be served by recalling Goo. Appellant knew Goo, knew his connection with the sewer board, and could have produced evidence, if there was any, to refute his testimony. There is no element of surprise involved. There is no indication Goo's testimony was false. Goo was having financial problems, and, as he testified, he could not get a loan from anyone, except appellant. The State can hardly be blamed for Goo's losses, regardless of the compassion we may entertain for his unfortunate position.

Donald Ray Hagerman was not a witness at any of appellant's trials. He apparently gave testimony to the grand jury adverse to appellant. He has not furnished an affidavit to appellant, but two undated letters from Hagerman are attached to support the motion for new trial. He states there that he testified before the grand jury that appellant had asked him to kill Frank Roitz (brother of William Roitz, member of the sewer board), burn down his house and also set some mall on fire. The letters were addressed to Mr. Van Sciver, one of appellant's trial attorneys in *Hopkinson I* and for awhile afterward. Hagerman, by the letters, wants to withdraw his accusations and asserts they were lies; he was doing so only for revenge and because he was high on drugs. Hagerman also claims in one letter that Hickey told him he and Jeff Green blew up the house to scare Vehar from investigation of crimes they committed in the Valley, but they did not want to kill him. Vehar was not a prosecuting attorney or law enforcement officer.

The tenor of the undated letters, along with an entry in the record, *Hopkinson II*, indicates that they were written to Mr. Van Sciver subsequent to appellant's trial, *Hopkinson I*. By appellant's brief here and the appellant's trial court brief in the record in this appeal, it is alleged that the indictment to which Hagerman's letters refer was dismissed. We do not know of the dismissal because that indictment must be one of three returned against appellant, which resulted from continuing grand jury investigation that went on following the trial in *Hopkinson I*. They do not appear in the record, *Hopkinson II*, though the fact of further grand jury indictments against appellant does.

In *Hopkinson II*, the prosecution proposed using some of the evidence gathered in the investigation carried on after *Hopkinson I* was tried, before this court's decision was handed down as to that case and before the penalty phase, *Hopkinson II*, was tried. In the prosecutor's notice of evidence it would produce that was filed in *Hopkinson II*, it is set out that Hagerman was a prisoner in the Wyoming State Penitentiary. The notice relates that while there appellant promised Hagerman money "to kill and burn Frank Roitz and any of the Roitz family who were present; and that he (Hagerman) was to firebomb the shopping center of Charla Green Youngberg, Jeff Green's older sister." Additionally, it is related that Hopkinson told Hagerman he would have him tortured just like Jeff Green was. It was represented that exhibits would include writings between ap-

pellant and Hagerman. (*Hopkinson II* —Vol. III, p. 473)

We do not set out the foregoing as establishing any guilt in that those additional indictments have not been tried, nor was Hagerman a witness in *Hopkinson II,* and it may be that the indictment was dismissed as represented by appellant's counsel, but we only include it for the purpose of showing that it is immaterial to the six charges upon which appellant was found guilty and sentenced in *Hopkinson I* and *Hopkinson II.* We would add that the original indictment filed in *Hopkinson I* contained 14 counts. All the six counts upon which appellant was tried, convicted and sentenced were severed and the other eight counts are undisposed of.

Hagerman's testimony would not be pertinent for the purpose of considering whether a new trial should be granted. The trial judge from the record and his knowledge as trial judge knew all about the foregoing, so he did not need to hear any testimony Hagerman might furnish.

▉▉▉ The State filed in the district court a comprehensive response to the motion for new trial. Appellant's motion with argument and affidavits attached, and the trial judge's intimate knowledge gained from his presiding over lengthy trial proceedings, rendered superfluous any further hearing at which the same arguments would be repeated and the same lack of need to take testimony would be shown. We have no intention of stripping the trial judge of his discretion to practice common sense in refusing a hearing to take testimony when all that is necessary for disposition is already in the record. There may be occasions when a hearing may be advisable, but this is not one of them. We do not hold that in every case an oral hearing with appearances and the taking of testimony is not required. More explicitly stated, we also do not hold that discovery is not available in the disposition of a motion for new trial. Nor do we, in making that statement, intend to open the door to discovery in cases such as the one before us. In *Harris v. Nelson,* 394 U.S. 286, 300, 89

S.Ct. 1082, 1091, 22 L.Ed.2d 281, 291 (1969), reh. denied 394 U.S. 1025, 89 S.Ct. 1623, 23 L.Ed.2d 50, the court made the following statement:

"* * * We are aware that confinement sometimes induces fantasy which has its basis in the paranoia of prison rather than in fact. But where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry. Obviously, in exercising this power, the court may utilize familiar procedures, as appropriate, whether these are found in the civil or criminal rules or elsewhere in the 'usages and principles of law.'" (Footnote omitted.)

The dissents in that case felt the statement too broad and feared it was a rule that extended beyond the habeas corpus proceeding the case was considering and other post-conviction procedures. Justice Harlan, joined by Justice White, observed that it might reach motions for a new trial not authorized by Rule 33, F.R.Cr.P. (Rule 34, W.R.Cr.P., supra, n. 1) and special rules were necessary. We mention this only to observe that if the case could be applicable, the appellant has not made a sufficient showing of reason to believe that even if an evidentiary hearing was held, he would be able to develop an entitlement to relief.

### III

What appellant refers to as "the prosecution's intimidation, concealment and surprise tactics deprived Hopkinson of his right to a fair trial under both the federal and state constitutions" is a different description of the same issue raised and disposed of in *Hopkinson I* and *Hopkinson II.* Under this issue, various assertions are made. While this is delineated as a separate issue, it is apparently the ultimate question arising from what appellant calls an issue, covered in Part IV of this opinion, claiming error for failure of the district

judge to remove the special prosecutors. Various acts of purported misconduct by the special prosecutors are alleged, such as preventing prosecution witness Kristi King from being interviewed by defense counsel by frightening her; refusal of other State witnesses to discuss their knowledge with appellant's counsel and investigators; failure of the State to grant immunity to various witnesses; prejudice by the presence of large numbers of guards, references to witnesses being in protective custody, participants wearing bulletproof clothing, and the proximity of the prosecution team to the jury box so that jurors could overhear their comments.

Then, apparently by way of corroborating this charge of pressure during trial, there is presented an array of affidavits by persons, mostly felons, claiming similar treatment by the prosecution at various times during continuing grand jury investigation following the trial, *Hopkinson I.*

The question of refusal of the State's witnesses to discuss their testimony with appellant was covered by this court in *Hopkinson I,* 632 P.2d at 144. The trial judge informed Jennifer Larchick of her right to talk to counsel as well as her right to refuse to do so. She only wanted to finish her testimony and go home. The trial judge ordered the prosecution to make her available to the defense for questioning. She was made available and defense counsel did not avail themselves of the opportunity but in open court expressed a desire to talk to her after the trial, though no objection was made to her being discharged from further attendance under her subpoena following her testimony during the State's case in chief. The witness Kristi King was advised by the trial judge she could talk to appellant's counsel if she would like to.

The unsigned affidavit of Kristi King bears a date, "this —— day of August, 1981." For over two years, she has apparently refused to sign it. It appears that Kristi King talked to appellant's present counsel, but there is nothing even in the unsigned affidavit, which purportedly represents what she told appellant's counsel, to indicate her testimony would be any different than during the original trial. Her apparent discomfiture on the witness stand at the time of the trial in *Hopkinson I* attracted the attention of the trial judge, and with notice to counsel that their verbatim transcribed conversation in chambers would be furnished, he discussed the matter with her. Immediately following the conversation, it was read back by the court reporter to counsel. The transcription appears in the record. (*Hopkinson I*—Tr. Vol. XII, p. 1636, et seq.) She stated she was more nervous than frightened and was acting upon the advice of her lawyer brother that when testifying, to do no more than answer the questions. She had never previously been a witness or in a courtroom. Nothing new with respect to Kristi King is presented to this court in this appeal. It has already been considered, and there is no indication that the outcome would be any different.

■ The appellant repeats an old question anew when he raises the question of the presence of guards, references to witnesses being in protective custody and the wearing of bulletproof clothing, and the physical structure of the courtroom which placed the prosecution team adjacent to the jury box. This was raised in *Hopkinson II,* and in some detail this court discussed the allegation. 664 P.2d at 85–86.

The entire records of *Hopkinson I* and *Hopkinson II* are here for our use. The appellant has given us no record references nor do we find anything in the record of the guilt phase, *Hopkinson I,* that suggests the influence of the factors mentioned would prejudice the appellant. It is noted that the affidavits of Messers Van Sciver and Brass, counsel for appellant during the *Hopkinson I* trial, are guarded in their characterization of the atmosphere by prefacing their observations with the words, "[t]he defendant *may* also have been prejudiced by" (emphasis added) the presence of guards, etc.

The jury was instructed at the beginning and at the close of the guilt part of the trial

that it was to perform its duty uninfluenced by "passion or prejudice against any of the litigants in this case, or by public opinion or public feeling." (*Hopkinson I* —Tr. Vol. III, p. 680) At the close of the trial, *Hopkinson I,* the trial judge completed the "Questionnaire to and Report of the Trial Judge" prepared by this court as required by § 6–2–103(b), W.S.1977. On October 19, 1979, he submitted one such report followed by a slightly revised version dated February 15, 1980, which was filed with this court on March 5, 1980. In both, Part E.1., question 10 asked "[w]as there any evidence that the jury was influenced by passion, prejudice, or any other arbitrary factor when imposing sentence." In both, the answer of the trial judge was "No." This question would have gone to the entire trial because the same jury in *Hopkinson I* sat on both the guilt and sentencing phases. Copies of both the completed questionnaires and reports were sent by the trial judge to counsel for their comments. The trial judge noted on the February, 1980, report that he had received no comments or responses from anyone with reference to the October, 1979, report, nor do we find in the record any response to the latter dated report.

█ The matter of the presence of guards and security measures during the course of the trial was considered in the voir dire of the jury during the selection process. The questions in that regard were initiated by counsel for the appellant:

" * * * The mere fact that there are 8 matrons or 4 matrons and 4 guards and that there is 24 hour surveillance and some people have body guards, does that lead any of you to believe one way or the other with respect to guilt?" (*Hopkinson I*—Tr. Vol. I, p. 196)

Immediately following that question, the trial judge explained that:

" * * * The reason there are 8 bailiffs is because it's very difficult for 2 bailiffs to handle a jury 24 hours a day. Period. That's why. There will be shifts of bailiffs and somebody gets a day off. That's

why there are 8 bailiffs and the only reason."

All jurors were excused who thought security measures taken related to the guilt of the defendant. Most responded that they considered it only a part of an important case and had nothing to do with guilt. The purpose of the voir dire was served and there can now be no complaint.

█ It is normal and required that jurors be sequestered in capital cases, § 7–11–210, W.S.1977, and this requirement should be rigidly enforced, *State v. Radon,* 45 Wyo. 383, 19 P.2d 177 (1933).

[20] It must be realized, and we take judicial notice of the fact of life, that violence in the courtroom and its environs is not unique. The prosecutors were aware through their investigative efforts and that of law enforcement officers of the appellant's proclivities toward threatening or elimination of lawyers (Mariscal and Vehar) and witnesses standing in his way. Jeff Green was murdered just before he was to testify before the grand jury. There was a conspiracy to kill William Roitz, a witness. Hindsight unveils the justification for their fears. If there was fright in the atmosphere, it was induced by the proven lawless conduct of appellant. The trial judge has the responsibility of making appropriate arrangement for the security of the courtroom and trial participants. There is no prohibition against counsel and others wearing protective garments and using bodyguards as long as they are not dramatically displayed to purposely project a suggestion of guilt of the defendant. The record does not disclose abuse in that regard and shows great care by the court to prevent prejudicial soiling of the proceedings. There is no necessity for a new trial on these grounds. The judicial system if it is to survive must afford protection for its participants from criminal elements bent on its destruction.

As to the matter of granting immunity to Mike Hickey, this court also addressed that at length in *Hopkinson II,* 664 P.2d at 62–63. The reasons and legal justification for granting immunity as part of a plea

bargain were explained and are a matter of prosecutorial discretion. No plea bargains are involved with the witnesses appellant suggests should be granted immunity.

Appellant submits that all the persons he wishes to call, such as John Suesata, should be granted immunity. In the first place, it was never requested or even mentioned when the opportunity in *Hopkinson I* was present. At the urging of the defense, Hap Russell was granted partial immunity by the trial judge. The mere statement of the proposal, in the tone of all the circumstances of this case, provides the answer. It would be a great boon to the prison population and criminal fugitives in general. Immunity is not granted willy-nilly.

We view with some amusement that appellant complains that the prosecution occupied the counsel table nearest the jury box, so that the jury could overhear comments amongst those so seated. Early on, before the trial started, *Hopkinson I,* appellant's counsel wanted that table. The trial judge explained that historically the prosecution occupied that location in his organization of the courtroom. Both sides could not sit there. Appellant shows us nowhere in the record that the jury overheard any comments from the prosecution or that to have been an influencing factor in any way. The seating arrangement and organization of the courtroom are within the discretion of the trial judge, adapted to the available facilities. We cannot decide on matters upon which the record is silent. *Hopkinson II,* 664 P.2d 43, 85.

We wish it made clear that we have considered the due process implications reflected in and raised by this issue as to a new trial and in the light of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), wherein it was held that due process requires the State to disgorge exculpatory materials. We cannot find in the record that the prosecution denied appellant any exculpatory materials that it knew of. We further note that there were few, if any, to disclose. We also have considered *United States v.*

*Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), wherein failure to grant a new trial on the ground of new evidence was denied by the trial court and affirmed. The claim was made that the defendant was deprived of a fair trial under the rule of *Brady v. Maryland,* supra. The supreme court outlined three situations in which *Brady* applied: (1) demonstration that perjured testimony known, or which should have been known, to the prosecution was used; (2) suppression by the prosecution of requested material exculpatory evidence (*Brady*); and (3) a duty of the prosecution to without request turn over material exculpatory evidence to the accused; that does not include any duty to turn over the entire file, but only that the omitted evidence creates a reasonable doubt that otherwise did not exist. In other words, with respect to (3), if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed, but if there is no reasonable doubt about guilt, whether or not the additional evidence is considered, there is no justification for a new trial.

We found no *Brady* or *Agurs* constitutional errors relative to a new trial when considering the conduct of the prosecutors.

## IV

The appellant argues as an issue that the special prosecutors should have been removed when it was so moved in connection with the motion for a new trial. Included in this argument were assertions that the special prosecutors were not skilled as prosecutors but were primarily criminal defense attorneys when engaged in the practice of the criminal law and thus apparently not properly equipped to be prosecutors and in addition frightened and used abusive methods with witnesses.

On the matter of lack of experience is the innuendo that the prosecutors do not understand the necessity of protecting the constitutional rights of a defendant charged with a crime. To that, we say that as experienced criminal defense trial coun-

sel, their awareness of those rights would be most acute because that is the stock in trade of the criminal defense bar. We would point out that Mr. Spence was county and prosecuting attorney for Fremont County, Wyoming, for two terms during the years 1954–1962. VI Martindale-Hubbell Law Directory, p. 1085B (1984). Our detailed examination of the record discloses that both Mr. Spence and Mr. Moriarity are well versed in the art of trial advocacy and had an intimate knowledge of all the facts gathered from an exhaustive investigation which had left no stone unturned. There is no doubt but that meticulous preparation by the prosecution often leaves most frustrated a defendant charged with crime.

We have heretofore in this opinion reviewed what occurred during the trial with respect to the witness Kristi King. She may have appeared fearful, not because of conduct by the prosecutors but was nervous and acting upon the advice of her lawyer brother to not "answer anything more than you have to say." Counsel in *Hopkinson I* complained to the trial court about the alleged attempts of the prosecution to prevent her from being interviewed by the defense. The trial judge advised her that she could be interviewed but was not required to submit to interview if she did not wish to do so. The appellant did not pursue the matter further. This court covered that in *Hopkinson I*, 632 P.2d at 144–145, and held a witness may refuse to talk to counsel and pointed out that under Rule 18(c), W.R.Cr.P., statements of witnesses may be demanded after testifying on direct examination. *DeLuna v. State*, Wyo., 501 P.2d 1021 (1972). No such demand was made, but the record also indicates the defense had her grand jury testimony before she testified. This court also in *Hopkinson I* considered the same complaint with regard to the witness Jennifer

Larchick and found it had no merit. *Hopkinson I*, 632 P.2d at 144.

The appellant urges that the affidavits of various penitentiary inmates relating to contacts with prosecution attorneys support allegations of misconduct by the prosecution. We find that they all related to purported occurrences during an ongoing grand jury investigation following the trial of *Hopkinson I*. Even if true, they are irrelevant and at most only corroborative. *Grable v. State*, supra. None of those furnishing affidavits were witnesses during the trial in either *Hopkinson I* or *Hopkinson II*, other than Hap Russell. Further, they are unworthy of belief.

The affidavits of appellant's trial counsel, *Hopkinson I*, are no more than a reiteration of an issue made on appeal, *Hopkinson I*, and disposed of at that time by this court.

There is no indication that evidence or witnesses favorable to appellant were being concealed. Prior to the trials in both cases, lists of witnesses were filed. In *Hopkinson I*, the witness list in the file contained the names of about 240 witnesses (*Hopkinson I*—R. Vol. II, pp. 108–120) and a list of 250 exhibits (*Hopkinson I*—R. Vol. II, pp. 121–136); notice of defendant's statements to Mike Hickey, Jennifer Larchick, Hap Russell, Kristi King, Harold James Taylor, William Roitz, J.R. Goo, Jr., and many others was also given to appellant. (*Hopkinson I*—R. Vol. II, pp. 158–167) The grand jury testimony of witnesses was turned over to appellant's counsel and a summary of their testimony was furnished in advance of trial. In *Hopkinson II*, the list of witnesses found in the files contained the names and addresses of 399 witnesses plus a supplemental list of 27 more.[7] (*Hopkinson II*—Vol. I, pp. 66–95; Vol. III, pp. 455–463) There were 463 ex-

---

7. We note with interest that the State listed as witnesses J.R. Goo, Don Hagerman, Jeff Dunn, Courtney Klekas, Helen Russell, John Suesata, Richard Weddle, Mike Hickey, Kristi King, Cindy Taylor Schrode, Jonathan Mauro (Ceccia), and Bobby Barnes. All these persons except Kristi King, Cindy Taylor Schrode, John Suesata, Mike Hickey and J.R. Goo have furnished

signed affidavits to appellant to support his motion for new trial and appellant wishes to examine or re-examine the latter named by way of discovery. We have herein discussed the inadequacy of the affidavits to establish any right to a new trial and the futility of calling those who testified at the trial, *Hopkinson I*.

**1030** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

hibits listed. (*Hopkinson II*—Vol. I, pp. 32–65) The names of all witnesses and exhibits used appear on the lists; none were concealed.

The cases cited by appellant do not support any reason to even consider discharging counsel and barring their further representation of the State. The special prosecutors have been on the job for several years now. They are the best equipped because of their experience, understanding, and knowledge of the case to adequately deal with all post-conviction and sentencing procedures that are so consistently being inappropriately revived without support. It would be a form of obstruction of justice to remove them as prosecutors.

An overview of the entire trial proceedings in *Hopkinson I* and *Hopkinson II* discloses a vigorous prosecution by competent counsel striking hard blows but not foul ones, *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935), and we find no valid reason presented why they should be removed from the case.

## V

▮▮▮ The appellant complains that the trial judge, Robert B. Ranck, abused his discretion by failing to recuse himself upon the filing of Hopkinson's motion for change of judge pursuant to Rule 23(d) and (e), W.R.Cr.P.[8] After amendment a trial judge may only be disqualified for cause. The motion for change of judge which we are now considering was filed on August 1, 1983, after the amendment of Rule 23(d), W.R.Cr.P. The appellant showed some minor concern about which rule applied, Rule

**8.** Previous to June 13, 1983, Rule 23(d) and (e), W.R.Cr.P., read:

"(d) *Peremptory disqualification.*—The state or the defendant may peremptorily disqualify a district judge by filing a motion for change of judge. Such motion shall be filed at least fifteen (15) days before the date set for the hearing on any motion filed pursuant to Rule 16, W.R.Cr.P., or if there be no such motion hearing set, at least fifteen (15) days before the date set for pretrial, and if there be no pretrial set, then at least fifteen (15) days before the date set for trial, or if the date is set within fifteen (15) days after the order of setting, within five (5) days after receipt of such order; provided, however, that no more than one (1) such motion shall be filed by the state or by any defendant. After the filing of such motion for change of judge, the presiding judge shall immediately call in another district judge to try the action.

"(e) *Disqualification for cause.*—After the time for filing a motion for peremptory disqualification of the presiding judge has expired, the state or the defendant may move for a change of district judge on the ground that the presiding judge is biased or prejudiced against the state, the prosecuting attorney, the defendant or his attorney. The motion shall be supported by an affidavit or affidavits of any person or persons stating sufficient facts to show the existence of such ground, together with an affidavit of the prosecuting or defense attorney showing that the facts stated were unknown to him and could not have been discovered by the exercise of reasonable diligence prior to expiration of the time for filing a motion for peremptory disqualification. Prior to a hearing on the motion any party may file counter-affidavits. The presiding judge shall rule on the motion, and if he grants the same shall immediately call in another district judge to try the action. A ruling on a motion for a change of district judge shall not be an appealable order, but the ruling shall be entered on the docket and made a part of the record, and may be assigned as error in an appeal of the case."

As a result of amendment, on and after June 13, 1983, Rule 23(d), W.R.Cr.P., reads:

"(d) *Disqualification for cause.*—Whenever the grounds for such motion become known, the state or the defendant may move for a change of district judge on the ground that the presiding judge is biased or prejudiced against the state, the prosecuting attorney, the defendant or his attorney. The motion shall be supported by an affidavit or affidavits of any person or persons stating sufficient facts to show the existence of such ground. Prior to a hearing on the motion any party may file counter-affidavits. The presiding judge shall rule on the motion, and if he grants the same shall immediately call in another district judge to try the action. A ruling on a motion for a change of district judge shall not be an appealable order, but the ruling shall be entered on the docket and made a part of the record, and may be assigned as error in an appeal of the case."

Rule 23(e), W.R.Cr.P., was deleted upon amendment of Rule 23(d). It became surplusage. The publisher of Wyoming court rules has failed to note in the supplement to the court rules that Rule 23(e) is no longer a part of the rule, even though the court's amending order showed the absorption of the cause provision into Rule 23(d).

23(e) before amendment or Rule 23(d) after amendment. It would make no difference. The time was long gone for a peremptory challenge under the old rule because the case had passed into the trial stage after which no peremptory change of judge was allowed under the old rule. Cause on the basis of bias or prejudice of the judge at that point is the only ground for change of judge either before or after amendment.

 The source of the for-cause provision of the rule is patterned after 28 U.S.C.A. § 144.[9] This court has defined " 'bias' and 'prejudice' " under Rule 40.1(b)(2), W.R.C.P., which has identical pertinent language to Rule 23(d), W.R.Cr.P., supra n. 8:

"The words 'bias' and 'prejudice' are not synonymous. One cannot be prejudiced against another without being biased against him, but he can be biased without being prejudiced. Prejudice involves a prejudgment or forming of an opinion without sufficient knowledge or examination. Bias is a leaning of the mind or an inclination toward one person over another. The 'bias' which is a ground for disqualification of a judge must be personal, and it must be such a condition of the mind which sways judgment and renders the judge unable to exercise his functions impartially in a given case or which is inconsistent with a state of mind fully open to the conviction which evidence might produce. [Citations.]". *Cline v. Sawyer*, Wyo., 600 P.2d 725, 728–729 (1979).

This court went on to say:

"Without a valid reason for recusal, a judge has a duty not to recuse himself. " 'Recusal and reassignment is not a matter to be lightly undertaken by a district judge. While, in proper cases, we have a duty to recuse ourselves, in cases such as the one before us, we have concomitant obligation *not* to recuse ourselves; absent a valid reason for recusal, there remains what has sometimes been termed a "duty to sit". [Citations.]' *Simonson v. General Motors Corporation*, U.S.D.C.Pa., 425 F.Supp. 574, 578 (1976)." (Emphasis in original.) Id., at 729.

See also to the same effect *United States v. Bray*, 546 F.2d 851 (10th Cir.1976). The duty-to-sit obligation is especially strong in complex, long, drawn out cases, where the disqualification request is not made at the threshold of litigation but after the trial judge has gained a valuable background. *Duplan Corporation v. Deering Milliken, Inc.*, 400 F.Supp. 497 (D.C.S.C.1975). We consider the case before us complex and many days of trial were involved.

 The trial judge in the appeal now being considered properly denied appellant's motion for change of judge. The affidavit supporting the motion does not state "sufficient facts to show the existence of such ground [bias or prejudice against the defendant]." The affidavit relied on was signed by Scott Hopkinson, brother of appellant:

"Scott Hopkinson, · being first duly sworn, upon his oath deposes and says:

"1. My name is Scott Hopkinson.

"2. An [sic] or about October or November, 1980, Judge Robert Ranck of the Teton County District Court of Wyoming, stated to Scott Hopkinson, 'You tell that family of yours that I have no intention of retrying that trial,' referring to the 1979 trial of Mark Hopkinson.

"3. Other witness [sic] that were present when the above statement was made were Roy Jacobson of Kemmerer,

---

**9.** 28 U.S.C.A. § 144:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

"The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith."

Wyoming, John Hursh of Riverton, Wyoming, and Lambertus Jansen of Salt Lake City, Utah.

"Further affiant sayeth not.

"Dated: __29__ day of June, 1983."

That affidavit was the only offered support for the change-of-judge motion, other than an affidavit of counsel for appellant that she had only recently learned of the purported statement. No affidavits of the others indicated as present at the time the statement was allegedly made were furnished.

*Hopkinson I* was on appeal before this court in October or November, 1980, when the statement was professedly made. What actually happened after those dates was that this court in 1981 set aside the death penalty returned by the jury in *Hopkinson I* and remanded the case for retrial of the penalty phase as to the murder of Jeff Green. District Judge Robert B. Ranck did preside in the retrial of the penalty phase and the new jury also returned the death penalty as a sentence. We have reviewed all the post-conviction filings in *Hopkinson I* and discover that there was no motion for a new trial filed following the judgment and sentence. The appellant appealed at once. No motion for a new trial was pending in October or November, 1980.

■ Without knowing the circumstances under which the statement was made, we are at a loss to view the statement as one made in the context of this case. The trial judge certainly would not and cannot even consider retrying the case unless he had before him a motion for new trial. The law is settled that a new trial cannot be granted on the court's own motion because it would raise serious questions of double jeopardy. *United States v. Smith*, 331 U.S. 469, 474–475, 67 S.Ct. 1330, 1333, 91 L.Ed. 1610, 1613–1614 (1947). A new trial can only be granted on motion of the defendant. 3 Wright, Federal Practice and Procedure: Criminal 2d § 551 (1982). If the brother of appellant was asking for a new trial, he cannot do so.

■ The applicable rule for change of judge is explicit in its requirement that the affidavit must state *sufficient* facts to show the existence of such ground. We are unable to ascertain from the affidavit whether Judge Ranck was expressing a personal view or a professional view gained from his several weeks' experience trying the case. A trial judge need only recuse himself if he determines that facts set out in the affidavit, taken as true, are such that they would convince a reasonable man that he harbored a personal as opposed to a judicial bias against appellant, *United States v. Dansker*, 537 F.2d 40 (3rd Cir. 1976), cert. denied 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), with knowledge of all the facts, *Ronwin v. State Bar of Arizona*, 686 F.2d 692 (9th Cir.1981), cert. denied —— U.S. ——, 103 S.Ct. 2110, 77 L.Ed.2d 314 (1983).

On the basis of what the appellant presents, no reasonable person, acquainted with all the facts, could justify recusal of the trial judge in this case on either the ground of bias or prejudice and we so hold. The trial judge was correct in his denial of the motion for change of judge.

CONCLUSION

We now conclude in this appeal, *Hopkinson III*, that appellant has not sustained his burden of convincing either the trial judge or this court that he is entitled to a new trial on the basis of what was presented. The trial judge, on the grounds of his knowledge found in the record and the inadequacy of support found in the motion for new trial, and all other motions considered in connection therewith, the written argument of appellant which accompanied the motion for new trial along with the written response of the State filed with him, could reasonably conclude as he did. *Grable v. State*, supra. The trial judge did not abuse his discretion. Appellant has received two fair trials. There must be some finality in the judicial process.

Affirmed and remanded for execution of the death sentence as directed in *Hopkinson II*.