HILL, Chief Justice.
[T1] Appellant, Martha Lou Mace (Mother), seeks review of an order of the district court issued upon the parties' cross-motions to modify their divorcee decree with respect to child custody. In that order, the trial court placed the parties' son (Child) in the primary custody of Michael Arthur Nocera (Father). Mother contends that the district court failed to afford her procedural due process with respect to her motion for a change of judge pursuant to W.R.C.P. 40.1(b), as well as in not removing himself as the presiding judge. She also contends that the trial court erred in allowing a custody evaluator, who was not licensed in Wyoming, to testify at trial, and in failing to take into account the living environment in Father's home. We will affirm.
ISSUES
[¶ 2] Mother raises these issues:
1. Did Judge Grant err when he failed to give procedural due process to [Mother] when [she] filed her motion pursuant to [W.R.C.P.] 40.1(b)(2) to change the district judge?
2. Did Judge Grant err in failing to remove himself as the presiding judge when [Mother] filed her motion pursuant to [W.R.C.P.] 40.1(b)(2) for a disqualification for cause of Judge Grant?
3. Did Judge Grant err when he allowed a custody evaluator to testify at trial when that custody evaluator was not licensed in Wyoming?
4. Did Judge Grant err when he failed to take into consideration the living environment of [Father] when he made his custody determination?
Father presents this "counterstatement" of the issues:
I. As a matter of law, may [Mother] legally challenge the testimony of a court- *919 appointed expert-and repudiate her stipulation for his appointment-on grounds that he has no Wyoming license?
IL As a matter of law, can Judge Grant's comment upon the evidence presented in the first day of the trial be regarded as proof of "personal" bias or prejudice, sufficient to render a judge unable to act and rule impartially?
III. Did Judge Grant abuse his discretion in awarding custody of [Child] to his Father-as Judge Kautz previously had done in the Eighth Judicial District-because Mother would do her best to deprive Father and [Child] of their relationship?
FACTS[1]
[T3] The parties were married on January 4, 19983. Child was born on October 12, 1992. On April 7, 1994, Mother filed a complaint for divoree. A Decree of Divorce was entered on May 18, 1994. With respect to custody of Child, the decree provided: "... [Mother] and [Father] shall have custody of the parties' minor child.... [Mother] shall have the primary care, custody and control of the minor child with visitation rights to [Father}." '
[¶4] In October 1994, Mother left Wheat-land to pursue enhancement of her career, as well as a romantic interest. As a result of that change of cireumstances, Father sought and was awarded "sole temporary custody" of Child. On October 17, 1994, Father filed a petition to permanently modify custody, asking that he be awarded primary custody of Child with Mother having visitation. Mother contested the matter. After a hearing on Father's petition, the district court issued a decision letter that summarized the divorce proceedings and the original custody arrangements. The district court noted that the custody arrangements, to which the parties stipulated, operated smoothly so long as both parties lived and worked in Platte County. The district court also noted that Father and Mother were involved in domestic violence incidents, but eventually both parties dropped those matters. At that time Mother resided in Deer Lodge, Montana, with her boyfriend, Kenneth Holkan, whom she met while he was incarcerated in Wheat-land for aggravated assault and battery (Mother worked as a jailer while in Wheat-land).
[T5] Employing the "best interests of the child" standard, the district court noted that neither parent had consistently demonstrated good judgment and that each considered Child "a prize to be won." However, finding Mother's testimony not to be credible and that Father was the parent "most likely to provide the child with stability, security, and an open attitude toward the other parent," the court awarded custody to Father and visitation to Mother. Mother sought reconsideration of the modification order, which was denied. When her attorney withdrew from his representation of her, she continued her battle pro se. Eventually, a middle ground was reached and another order modifying custody and visitation, again in favor of Father, was entered on December 8, 1995. The parties reconciled to some degree by 1997, and the district court approved a stipulation that provided for "joint custody" of the Child.
[¶6] On January 19, 2000, Father filed a petition for change of custody, and on February 10, 2000, Mother filed a counter-petition for change of custody. Mother also sought to have the case transferred to the First Judicial District in Cheyenne because all parties resided in Laramie County. Father opposed the transfer. However, the district court agreed that the matter should be transferred to Laramie County, and an order to that effect was entered on April 20, 2000.
[¶7] On August 8, 2000, the parties entered into a stipulation settling the matter of temporary custody pending further hearings, and the district court entered an order effectuating that stipulation on August 15, 2000. Although it is apparent that there were additional proceedings below, so far as the record on appeal shows, the next significant development in this matter occurred on April 12, *920 2002, when the parties, now including a guardian ad litem, stipulated to a custody evaluation to be done by Jorge L. Figueroa, Ph.D., a licensed psychologist practicing in Fort Collins, Colorado.[2] On December 6, 2002, after Dr. Figueroa's report had been made available to all parties, Mother filed a motion for an additional custody evaluation. Mother contended that she did not "know" Dr. Figueroa was licensed only in Colorado, and not Wyoming, and that his report indicated "an unfair bias" against her. Dr. Figueroa reached a conclusion that Child should be in the primary custody of Father because his was the more stable of the two homes, and Father was the parent most likely to encourage Child's relationship with the other parent. On December 10, 2002, based on Dr. Figueroa's report, as well as other materials in the voluminous record of this case, Father filed a motion for temporary custody. In a decision letter filed of record on December 31, 2002, the district court declined to order a second custody evaluation and set a schedule for a pretrial conference and a trial.
[¶8] The trial in this matter was conducted on three days: March 5, 2008, April 16, 2008, and April 30, 2008. On March 5th, the district court heard some brief testimony from Mother, mostly about her contentions that she had obtained a "no contact" order from the police to protect her from Father because he had been threatening her, harassing her by phone, and stalking her. She also repeated her allegations about Father's alcoholism, mental illness, neglect of Child, and general bad character. Rocklon Edmonds, a prosecutor for the City of Cheyenne, testified about his handling of criminal complaints filed by Mother against Father. With respect to those complaints, prosecution of Father was deferred and he was placed on probation. Later, a petition to revoke probation was filed but was dismissed because Mother was not available to testify at the hearing on the motion. Edmonds also testified that he had never issued a "no contact" order for Mother, and against Father, except for perhaps an "informal" suggestion to police to tell people quarreling in cireumstances such as those presented in this case, to stay away from each other temporarily. The district court also heard testimony from Dr. Figueroa, the gist of which already has been set forth. Martha Schilling, Ph.D., also testified as a witness that day. She was called on behalf of Mother. Her practice is limited to doing evaluations, including custody evaluations. Her testimony was limited to a cri-tigue of Dr. Figueroa's report, which she considered lacking in some respects. However, the source of some of her concerns was information provided to her by Mother that had not been otherwise validated or investigated (nor had much of it been previously reported by Mother in other court proceedings). Mother also called Gina John as a witness. She had been asked to treat Child at the Cheyenne Children's Clinic in 2000-2001, at Mother's behest, but without Mother first seeking Father's consent. John related that she did therapy but did not do custody evaluations and declined to enter into a therapeutic relationship with Child unless both parents fully consented to it and agreed to eooperate in the process. At the time, she felt she did not have "permission" from Father, although she conceded in cross-examination that she had no reason to believe that Father was opposed to the proposed counseling with her. She also conceded that she did not have a very good recollection of those events and that, because she was no longer employed by the clinic, she did not have access to the records created at the time of these events. In any event, her contact with Child was very limited.
[¶9] Father called Reanne White as a witness. For a time in 1990, the parties lived directly across the street from White. She and her husband continued to be friends with Father even after he moved away (and Mother remained at that location, whereas Father lived six or eight blocks away). She also knew Mother's other children, as well as the Child affected by this matter. Her testimony was principally to the effect that Mother bitterly complained about Father's drinking, *921 infidelity, and general irresponsibility, but she never saw anything that justified those criticisms. In addition, she related that both Father and Child came to visit them almost weekly, and the first three or four times he came to visit, the police came to her house. She testified that she never perceived that Father used his visits to "surveil" Mother, nor did he visit more often than was the custom between them after a police officer told Father he was to have "no contact" with Mother.[3] She also praised Father's parenting abilities and noted that Mother appeared to have her older children raise the younger children, as she worked very long hours. She testified that she did not see Father drink to exeess (only a beer or two). The final business of that day of trial was a request by the district court to hear the guardian ad litem's recommendations with respect to an interim custody order. For several years preceding the trial, the custody arrangement had been one week with Mother, then one week with Father. The guardian ad litem did not recommend an interim order that would alter the existing custody arrangement, although she clearly favored awarding custody of Child to Father. Her rejection of the idea of an interim order at that point in the proceedings was based upon a concern that yet another change in custody would not be good for the child, especially if it turned out not to be permanent. In his closing remarks, the district court said this:
Well, I guess I'm very concerned about Dr. Figueroa's testimony that [Child] should have a stable permanent custody situation soon rather than later, and in view of his recommendation, and apparent ly, what would be the guardian ad litem's position, that the father should have eusto-dy [.] It's hard to imagine. It would be a very, very compelling case that the mother would have to show for the Court to go against those very strong and seemingly well-founded recommendations.
Miss Schilling listened to all of Dr. Figueroa's testimony and [had] a copy of his report before, and it seems to me that many of the alleged deficiencies-that is, deficiencies alleged by her and criticism of Dr. Figueroa's evaluation go back to supposed allegations prior to the time these parties even met, prior to 1995.
Judge Kautz and his finding Mr. Nocera has had custody of [Child] for substantial periods of time since the divorce, and this shared custody was [stipulated in] 1997. That is just simply inconceivable to me that the mother would have agreed to this believing the things she apparently believes about him. It is just really hard to conceive of.
Dr. Schilling's critique does not refute any of Dr. Figueroa's conclusions. She only says she would have done the evaluation somewhat differently, and the notion that she would have relied on [Mother's] purported refutation of the report simply seemed unreasonable in the cireumstances Dr. Figueroa saw as evidence-as evidence of [Mother's] extreme antagonism toward Mr. Nocera and the unreasonableness of her demands and the unlikelihood of the validity of her perceptions.
So the critique of the evaluated recommendations are really very material to the decision. -It just seemed to me [Child] is harmed more every day that he is in this back-and-forth thing. It seems to me almost inherently, at this point, unhelpful for him, not in his best interests, but I guess your recommendation, at this point, is that [an] interim order still not ought not to be done until such time, if there is to be such time, as it would not be tentative in any way.
[¶ 10] Counsel for Mother vehemently objected to the district court's comments, asserting that they violated her due process rights and deprived her of her day in court. In response to Mother's counsel's concern that the court needed to hear all the evidence, the judge commented: "I cannot imagine what advantage that might be. *922 That's what I'd like to hear." The district court then continued the trial until the next scheduled date for trial, which was to be on April 16, 2008, noting that he would make an interim order at that time.
[T11] On April 14, 2008, Mother filed a motion to change district judge contending that the presiding judge was "biased or prejudiced" against her. Her affidavit was attached to the motion. The district court set that motion for hearing on April 16, 2008, and it was taken up as the first order of business on that date. Mother's attorney noted that the presiding judge had decided to hear the motion himself, rather than assign it to another judge, but did not specifically object to the proceedings on that basis. The presiding judge made reference to the applicable rule, W.R.C.P. 40.1(b)(2), which allows for just such a cireumstance, and noted that the timing of the motion did not afford the trial court the opportunity to assign another judge to hear the motion. The district court declined to hear testimony from Mother and relied only on her affidavit, as well as the argument of counsel and the guardian ad litem, in deciding the motion. Mother's counsel objected to that procedure but did not articulate a specific factual (offer of proof) or legal basis for the objection. In argument, Mother relied on the comments made by the district court at the conclusion of the March 5th hearing, as well as a perception that the district court did not pay attention to Dr. Schilling (he was reading court documents and taking notes during her testimony). The district court denied any bias or prejudice against Mother (though he conceded he may have been a bit impatient at times) or that he had prejudged the case. The district court then denied the motion for a change of judge.
[¶12] Father was the first witness to testify on April 16th. He related that he agreed to the 1997 modification of child custody at Mother's insistence and against the advice of his counsel. The parties then split up again shortly thereafter and they had an informal custody arrangement for a period of time. When Mother remarried, Father wanted a more formal, structured custody plan in place. An arrangement acceptable to both parties was eventually worked out-one week with Mother, one week with Father. Suffice it to say, his further testimony related the rather difficult history Mother, Father, and Child had endured together. Mother's current husband, Jake Edward Hardin, testified as to his perceptions of the interactions between Mother, Father, and Child during the time he had been in the picture. A friend of Mother testified that on one occasion, Father had shown up in an inebriated condition at Mother's house while Mother was in Hawaii for temporary military duty. Cheyenne Police Officer Bonnie Bris-tow (formerly Marquart) testified about her investigation of Mother's complaints about phone harassment. A caller ID device showed 50-60 calls from Father to Mother in one 24-hour period. Officer Bristow related that when she delivered a ticket/summons to Father, he was "extremely belligerent," but not intoxicated and not "seary." At that time, she issued Father a verbal "no-contact" order. Officer Bristow admitted on eross-examination that there was no content to the telephone calls at issue, just many calls that were not answered. She also stated that she had no further contact with either Mother or Father since that episode. In connection with the phone call incident, Officer Bristow testified that she went to the Whites' house (they lived across the street from Mother), and told them that if Father "was coming over and doing that kind of activity [spying], that they should be aware of it, and that it is against the law ... to do that, to spy on her."
[¶ 13] The third day of the trial was held on April 30, 2003. The main purpose of that session was to hear Mother's testimony. Mother testified that her main concerns were Father's "stalking, for one thing; the manipulating of theee-the principals, teachers." She added to this, "city attorneys, county attorneys, whomever, whoever he spoke with on different occasions to do a multitude of things, criminal." She related that she reconciled with Father in 1997 because: "He said it was a package deal, like I had to put up with him in order to have any kind of contact with [Child], and that was during that time period that he refused to allow me visitation." She testified that Father stalked her "daily." She testified to two incidents *923 (her oldest daughter corroborated one of these incidents), where Father held a gun on Mother and the children and threatened them. However, these incidents were not reported to police and they occurred early in the parties' relationship. Another of Mother's central concerns was that if Father had primary custody of Child, he would use that time to alienate Child from her.
[¶ 14] At the conclusion of the final day of trial, the district court ruled generally in favor of Father, based upon the evidence presented by the parties, the relative eredi-bility of the parties, Dr. Figueroa's report, and because Father was the parent more likely to foster a positive relationship with the other parent. Since the parties were unable to reach an agreement on visitation, the district court entered an order directing that Child be placed in the primary custody and control of Father, with Mother to have "standard visitation."
DISCUSSION
Did the Trial Court Deny Mother Procedural Due Process on the Motion to Change Judge
[T15] W.R.C.P. 40.1(b)(2) provides: Rule 40.1. Transfer of trial judge and change of judge.
[[Image here]]
(b) Change of Judge.-
[[Image here]]
(2) Disqualification for Cause.-Whenever the grounds for such motion become known, any party may move for a change of district judge on the ground that the presiding judge: (A) has been engaged as counsel in the action prior to being appointed as judge; (B) is interested in the action; (C) is related by consanguinity to a party; (D) is a material witness in the action; or (E) is biased or prejudiced against the party or the party's counsel. The motion shall be supported by an affidavit or affidavits of any person or persons, stating sufficient facts to show the existence of such grounds. Prior to a hearing on the motion any party may file counter-affidavits. The motion shall be heard by the presiding judge, or at the discretion of the presiding judge by another judge. If the motion is granted, the presiding judge shall immediately call in another judge to try the action. [Emphasis added.]
[¥16] Father objected to the motion because of timeliness and because of a lack of notice. The district court sustained those objections. The rule directs that such a motion be filed when the grounds for it become known. We will set out the content of the affidavit in full below, but it is clear that the motion was based upon Mother's perception of the general demeanor of the trial judge during the March 5, 2003 hearing, 'as well as his comments to Mother and her attorney at the conclusion of the first day of trial. Nonetheless, the motion was not filed until two days before the second day of trial and was not served until the day before trial. The timely filing of such a motion is one of substance and not merely of form. Barbour v. Barbour, 518 P.2d 12, 183 (Wyo.1974); and see generally, Walker v. Walker, 248 Ga.App. 177, 546 S.E.2d 315, 318 (2001) (motion untimely where it was not filed within five days of the time a party learned of the alleged basis for recusal and showed no good cause for delay); and J.H. Cooper, Annotation, Time for Asserting Disqualification -of Judge, and Waiver of Disqualification, 78 ALR.2d 1238, esp. § 10 (1960 and Later Case Service 2004). Given these circumstances, it appears the district court would have been justified in declining to consider the motion because it was untimely.
[¶ 17] The substance of Mother's affidavit in support of her motion for change of judge was this:
1. I request that Judge Grant remove himself from my case. During the hearing on March 5, 2003, I felt that Judge Grant raised his voice to my attorney. Judge Grant also attempted to grant custody of my ten year old son to his father, Michael Nocera without me being allowed to present my side of the case.
2. I further feel that Judge Grant showed impatience toward my attorney and prejudice to me by his words and actions during the hearing.
*924 3. During the hearing Judge Grant would not allow my attorney to ask further questions of a witness who I considered to be a questionable psychologist from Colorado. When my attorney asked to be allowed to further question this witness, Judge Grant raised his voice and informed my attorney that the witness was dismissed.
4. I believe that the Judge was not paying attention to my psychologist witness as I believe he was reading and writing on papers during her telephone testimony.
5. Judge Grant asked for the guardian ad litem's recommendation as to the custody of my son pending the case being finished, which was without me being allowed to present my side of the case. My attorney objected to this, however, I feel that the Judge yelled at her about continuing to allow my son to be in a situation that causes him harm.
6. Judge Grant said from the bench that I would have to produce some really good evidence to make him change his mind in this case.
7. Due to the actions and statements of Judge Grant, I believe that he is biased and prejudiced regarding my case and has already made up his mind without hearing my side of the case. I strongly believe that I will not be granted an impartial hearing.
[¶18] We have held that notice and the opportunity to be heard are the touchstones of due process of law. Pecha v. Smith, Keller & Associates, 942 P.2d 387, 391 (Wyo.1997). The hearing provided must be appropriate to the case at hand and contemplates the opportunity to be heard at a meaningful time and in a meaningful manner. Jones v. Jones, 903 P.2d 545, 548 (Wyo.1995) (quoting Moore v. Board of Education, 836 S.W.2d 943, 947 (Mo. Banc 1992)). The district court held a hearing. The record re-fleets that the district court declined to hear testimony from Mother's husband, Jake Hardin. Hardin had not submitted an affidavit. Mother's attorney made no offer of proof with respect to what the import of Hardin's testimony would be. Mother was then called to testify. After some discussion, the district court declined to hear Mother's testimony on the change of judge issue, choosing instead to rely solely on her affidavit. Mother's counsel objected. The district court asked for the basis for the objection and counsel replied: "Just an explanation from her in terms of her in person and why it's important to her." Mother's attorney did not make an offer of proof as to what her live testimony might have added to the affidavit The district court noted that he understood it was important to her, and that her affidavit was in front of him. The district court also commented with respect to Mother's affidavit: "Since this sets forth a number of subjective conclusions, I don't know how you could count it by affidavit."
[T19] After hearing argument from the parties, the district court made this ruling:
As I've indicated earlier, there are a couple outstanding features of this motion. First and most important, in the view of the Court, is it is a series of conclusionary statements based on subjective opinion, so it is not as easy a thing to deal with if there were some specific factual problems such as the judge had ex parte contact or something of that nature. It's based on a perception of one of the litigants.
Going to the point about the Court's expression of concern about maintaining the status quo while this litigation grinds on and on, certainly, I did express that view, and I think quite properly so. The key, essential, and really only issue in this case is the best interests of the child who has been the object of this combat off and on over a period of nine years.
The expert witness who did the stipulated child custody evaluation expressed grave concern about the well-being of the child in the status quo of 50-50 shared custody. Mrs. Schilling testified by way of a critique of Dr. Figueroa's opinion, and Mr. Moxley's correct, I was taking notes during the telephone testimony of Dr. Schilling, and I was listening, I think quite attentively, to that testimony, and the crux of it is that she did not purport to take issue with any of the evaluators' conclusions, opinions; rather, she testified that there are some items of methodology that she would have differed on. She would *925 have conducted the evaluation in a somewhat different way.
She simply didn't try to refute any of the essential and important conclusions or opinions of the stipulated custody evaluator, and it was on the basis of that man's testimony that the Court expressed concern, and that concern, of course, remained as to a perceived impatience.
I would say there is some impatience on behalf of the Court concerning this case. As I indicated earlier, it has gone on now for nine years. These parties have been on and off again, one time or another, back together, and then apparent-and they stipulate changes in the order. They continue to fight.
Judge Kautz held a trial and did a decision letter with findings. Those are all in the file. So any impatience is with the extended nature of this litigation while the best interests of the child sort of languishes. It seems to me it's yet another case of parental combat not in the interests of the child but regardless of the interests of the child. I think the evidence in this case thus far supports that.
My recollection comports with that of Mr. Moxley with respect to the termination of the interrogation of the witness. Those things can-simply cannot be allowed to go on endlessly. At some point, somebody cannot have the last word in interrogating the witness.[4] I think the rules clearly support the authority to control that sort of thing. There's no impropriety there.
So as to any impatience shown, specifically to Mrs. Serelson, that of course, is not directed to her in any way. Mrs. Serelson [has] practiced before this Court for many years. She's a highly competent attorney, well respected, and she's always been accorded commensurate treatment by the Court and will be.
She happens to be counsel in a piece of litigation that would try the patience of anyone, I believe. So there was no improper premature termination of the examination of the witness.
Affiant says the Court was not paying attention to psychologist's witness, Miss Schilling; was reading and writing on papers. Of course, that is critically important what she said about Dr. Figueroa's evaluation, and I was taking notes on her testimony, and as I say, that testimony was a critique going plainly to some of the methodology.
Asking for the guardian ad litem's ree-ommendation on an interim order, that consideration of that was very much in the best interests of the child. If I didn't sit on the bench, I'd have to produce some really good evidence to make him change his mind in this case. That, of course, is not verbatim. I believe I did express the view there would have to be a compelling case to overcome the strength of the evi-denee that the Court had heard so far to that point.
Finally, I would say I think it's a bizarre notion that a judge might be biased by the facts, by the evidence. An oxymoron of sorts, it seems to me. The other overriding feature of the motion in the affidavit that I referred to earlier is the matter of timeliness and timing. Here we are five or six weeks from that hearing. According to the rule, when the basis becomes known, this motion will be brought.
Well, there's nothing in this affidavit except reference to what occurred at that hearing five or six weeks ago. So it was certainly not brought when the alleged biases became known, and so to grant this motion would interpose yet another delay in this matter, which I think would be unconscionable.
*926 So the motion for change of judge is denied.
[¶20] After examining the information set out above, we conclude that the district court heard the motion for change of judge as contemplated by the governing rule, and in a manner appropriate to these cireum-stances. The district court gave the motion substantive consideration, and it did not deprive Mother of due process of law.
Did the District Court Err in Not Granting the Motion to Change Judge
[¶21] Mother also contends that the trial judge was duty bound to recuse himself in these circumstances. A trial judge need only recuse himself if he determines that the facts set out in the affidavit, taken as true, are such that they would convince a reasonable man that he harbored a personal as opposed to a judicial bias against a party. See Hopkinson v. State, 679 P.2d 1008, 1032 (Wyo.1984). Further, we have said:
We have defined bias and prejudice as follows: "Prejudice involves a prejudgment or forming of an opinion without sufficient knowledge or examination. Bias is a leaning of the mind or an inclination toward one person over another." Cline v. Sawyer, 600 P.2d 725, 729 (Wyo.1979). The fair meaning of any remark made by the trial judge must be interpreted in light of the context in which it was made. Brown v. State, 816 P.2d 818, 824 (Wyo.1991).
Metz v. Metz, 2003 WY 3, ¶ 20, 61 P.3d 383, ¶ 20 (Wyo.2003); also see Richardson v. Richardson, 868 P.2d 259, 262-63 (Wyo.1994); and TZ Land & Cattle Company v. Condict, 795 P.2d 1204, 1211-12 (Wyo.1990).
[¶22] We conclude that the district court did not err in declining to recuse himself in the midst of this trial.
Error in Admitting Testimony of Custody Evaluator
[T23] Mother contends that it was error for the district court to admit the testimony of Dr. Figueroa because he was not licensed to practice in Wyoming. This issue was not directly raised before the trial court. The parties stipulated to employing Dr. Figueroa as the custody evaluator, and there is no suggestion in the record or in Mother's brief that he performed that function other than in a fully competent manner.
[124] We note in passing that as a general rule, the fact that a mental health professional is not licensed goes at most to the weight to be given his testimony, not to its admissibility. State v. Walker, 58 Or.App. 607, 649 P.2d 624, 625 (1982). Whether or not a mental health professional should be permitted to testify depends upon his education, training, and experience. Bricker v. State, 80 Md.App. 532, 565 A.2d 340, 346-47 (Md.1989). Here, no question was raised about Dr. Figueroa's professional credentials; indeed, the parties stipulated to them.
[¶25] However, we conclude that neither cogent argument nor pertinent authority supports this contention, and we will not consider it further. See Odegard v. Odegard, 2003 WY 67, ¶ 29, 69 P.3d 917, ¶ 29 (Wyo.2003).
Did District Court Consider Father's Living Environment
[T126] Mother contends the district court did not consider Father's living environment in making its decision. In support of this contention, Mother points to evidence in the record that Father, while intoxicated, had driven with Child in the car, failed to provide proper supervision for the child, was "inappropriately angry, curses, yells and alienates the other parent," Dr. Figueroa's testimony that Father is not an "ideal parent" and sometimes puts his owns needs above the child (drinks beer and smokes cigarettes in front of Child), and Father's abusive nature; ete. We have detailed much of this information in our statement of the facts. There is nothing in the record to suggest that the district court did not consider all of this evidence in reaching its decision. Indeed, it is readily apparent that it did.
CONCLUSION
[¶27] The district afforded Mother due process of law in considering her motion to change judge. The district court did not err in declining to recuse himself. The district *927 court did not err in considering the evidence elicited from Dr. Figueroa. The district court considered all evidence presented at trial in reaching its decision. The order of the district court modifying custody is affirmed.

. Mother's brief did not include "a statement of the facts relevant to the issues presented for review with appropriate references to documents listed in the index of the transmitted record." WRAP. 7.01(c)(2).

. In his report, Dr. Figueroa stated that he had 15 years of experience in providing custody evaluation to Wyoming and Colorado courts.

. So far as we are able to ascertain from the record, this was a verbal directive of "no contact" (no specifics provided) and did not emanate from a judicial authority. The basis for it appeared to be that Father continued to visit the Whites even though Mother did not like that. Mother subsequently moved to a new location, and Father and the Whites continued to visit each other on a regular basis, just as they had done for many years.

. The record reflects that Dr. Figueroa testified on direct examination for 50 pages in the transcript, on cross-examination for 32 pages, was questioned by the guardian ad litem for 13 pages, and was on re-direct for 9 pages. When Mother's attorney asked to re-cross, the district court said: "No. We've beat this to death." However, the district court then relented somewhat, asking Dr. Figueroa a couple of questions himself. The district court then permitted Mother's attorney some limited re-cross before the witness was excused. Mother has not presented, either below or before this Court, a statement of what additional questions she would have asked had she been afforded additional opportunity(ies) to do so.